## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Pao Xiong d/b/a                                   Civil No. 08-27 (DWF/RLE)
Huff & Puff Tobacco,

                        Plaintiff,

v.                                                **MEMORANDUM**
                                                  **OPINION AND ORDER**
City of Moorhead, Minnesota,
a municipal corporation,

                        Defendant.

_____

Jeff Scott Olson, Esq., The Jeff Scott Olson Law Firm, SC; and Randall D. B. Tigue, Esq., Randall Tigue Law Offices, PA, counsel for Plaintiff.

James J. Thomson, Esq., and Mary D. Tietjen, Esq., Kennedy & Graven, Chartered, counsel for Defendants.

_____

### INTRODUCTION

       This matter is before the Court upon a Motion for Summary Judgment brought by the Defendant City of Moorhead, Minnesota (the "City").  For the reasons set forth below, the Court grants in part and denies in part the City's motion.

### BACKGROUND

       In January 2007, the City adopted municipal ordinance number 10-23-3, which governs the zoning for adult establishments.  The ordinance restricts the location of adult businesses to the City's light and heavy industrial districts.  The ordinance also contains

distance restrictions that prohibit adult businesses from being located less than 1,000 feet

from the:

> nearest property line of any land in a residential zone or in a planned unit
> development zone developed for residential use or an existing residential
> use, or of any daycare center, school, establishment with a liquor license,
> library, public park, religious institution, playground or other public
> recreational facility in any zoning district, whether within the city limits of
> Moorhead or not.

(Def. City of Moorhead's Mem. of Law in Supp. of its Mot. for Summ. J. ("Def's

Mem.") at Ex. 2.)

The terms of the ordinance further provide for the dispersal of adult businesses by

restricting adult businesses from locating within 500 feet of any other adult

establishment.  The ordinance contains a one-year amortization provision, but this time

period may be extended for an additional year upon application to the City.  Finally, the

ordinance restricts the hours of operation of adult businesses, requiring that they close

between midnight and 10:00 AM and that they close on Sundays and national holidays.

Plaintiff Pao Xiong ("Plaintiff") owns and operates Huff & Puff Tobacco ("Huff &

Puff"), a business within the City's limits.  Huff & Puff is an adult establishment subject

to regulation under the ordinance because more than twenty percent of its floor space is

devoted to sales of adult goods.[1]  Huff & Puff sells magazines, videos, vibrators, rubber

goods and novelties, handcuffs, blindfolds and lubricants, as well as handbags, greeting

cards, herbal medicines, tobacco products and accessories, herbal selvia, and incense.

Huff & Puff makes adult products available for off-site consumption, and does not

---

[1]     Seventy to seventy-five percent of Huff & Puff's floor space is occupied by
sexually explicit materials.

provide on-site adult entertainment.  Huff & Puff's location does not comply with the

City's ordinance and. in order to remain in business with the same business model,

Plaintiff must relocate Huff & Puff to another area.  Plaintiff has not yet relocated Huff &

Puff or changed the mix of products available there.  Plaintiff instead has sued the City,

challenging the ordinance under the First Amendment to the U.S. Constitution.  Plaintiff

challenges several specific aspects of the ordinance and its enactment, and also contends

that the ordinance is facially invalid.

## DISCUSSION

## I.      Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

Court must view the evidence, and the inferences that may be reasonably drawn from the

evidence, in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna

Bank of Mo.,* 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has

stated, "[s]ummary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy and inexpensive determination of every action.'"

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank,* 92 F.3d at

747.  The nonmoving party must demonstrate the existence of specific facts in the record

that create a genuine issue for trial.  *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th

Cir. 1995).  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

## II.      Challenges to the Ordinance's Terms and Enactment

An ordinance that does not constitute an outright ban on adult establishments is "properly analyzed as a form of time, place, and manner regulation."  *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46 (1986).  Time, place, and manner regulations are acceptable if they are "content-neutral" and if they are "designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication."  *Id.* at 47.

In applying the *City of Renton* test, the first task is to determine whether the ordinance is content-neutral.  "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."  *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). Thus, even if a time, place, and manner ordinance regulates only businesses selling sexually explicit materials, the ordinance is content-neutral if its purpose is to lessen "undesirable secondary effects attributable to such businesses, such as increased crime, lower property values, or deteriorating residential neighborhoods."  *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413, 1416 (8th Cir. 1994).  Here, the City's regulation was targeted toward reducing negative secondary effects.  The City specifically considered

adverse secondary effects arising from adult property uses such as increased crime, blight, and decreased property values, particularly where adult establishments are located near each other.  The City was also especially concerned about locating adult establishments near sensitive uses, like schools and public parks, and about preventing blight along the City's gateway areas bordering Interstate 94.  The ordinance is, therefore, content-neutral.

To survive First Amendment scrutiny, a content-neutral regulation also must be "designed to serve a substantial governmental interest."  *City of Renton,* 475 U.S. at 47.  Regulations reasonably designed to curb unwanted secondary effects of sexually oriented businesses serve a substantial governmental interest.  *Id.* at 50.  In identifying and measuring such secondary effects, a city may rely upon studies or evidence generated by other cities "so long as [that] evidence . . . is reasonably believed to be relevant to the problem that the city addresses."  *Id.* at 51-52.

Government bodies may not, however, rely on "shoddy data or reasoning" in enacting an ordinance regulating adult property uses.  *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002).  Under *Alameda Books,*

> [t]he municipality's evidence must fairly support the municipality's rationale for its ordinance.  If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.*  If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Id*. at 438-439.  Justice Kennedy's concurring opinion in *Alameda Books* cautions that a

municipality "must advance some basis to show that its regulation has the purpose and

effect of suppressing secondary effects, while leaving the quantity and accessibility of

speech substantially intact."[2]  *Id.* at 449.

> ### A.    Evidence Supporting the Ordinance

Plaintiff challenges the City's evidence supporting the ordinance.  Plaintiff

contends that the data supporting the ordinance was inadequate because it is "shoddy

data" under *Alameda Books*.

The City was presented with several studies for its consideration in enacting the

ordinance, including a 1989 Report of the Attorney General's Working Group on the

Regulation of Sexually Oriented Businesses prepared by the Minnesota Attorney

General; a 1984 study from Indianapolis called "Adult Entertainment Business in

Indianapolis, An Analysis"; a Los Angeles study from 1977 entitled "Study of the Effects

of the Concentration of Adult Entertainment Establishments"; a 1989 study called

"Relation of Criminal Activity and Adult Businesses" relating to Phoenix, Arizona; a

St. Paul, Minnesota study from 1987 entitled "Adult Entertainment, 40-Acre Study"; and

---

[2]      Plaintiff argues that *Alameda Books* heightened the evidentiary standard applied in
cases such as this one.  The Eighth Circuit has stated that *Alameda Books* "probed the
evidentiary parameters of the *Renton* test" and noted that Justice Kennedy's concurrence,
which is narrower than the plurality opinion, states the holding of the Supreme Court in
that case.  *SOB, Inc. v. County of Benton*, 317 F.3d 856, 861, 862 n.1 (8th Cir. 2003).
The Eighth Circuit has not, however, indicated that *Alameda Books* created a higher
evidentiary standard, and this Court has also concluded that a higher standard was not
adopted in that case.  *See Peterson v. City of Cosmos, Minn.*, Civil No. 03-6570
(DWF/SRN), 2005 WL 1267620 at *7 n.4 (May 27, 2005).

a 1988 Adams County, Colorado study entitled "Adams County Nude Entertainment Study" along with a 1991 update to this study.

Plaintiff challenges these studies on a number of grounds.  First, Plaintiff contends that these studies are "shoddy data" due to their age.  The Court recognizes that some of the studies on which the City relied, which have been used in support of ordinances upheld by courts for a number of years, are somewhat old.  While municipalities are not required to "conduct new studies or produce evidence independent of that generated by other cities," *City of Renton*, 475 U.S. at 53, there may come a time when these particular studies are so old and outdated that a municipality's reliance on the studies' analysis in determining relevant secondary effects will no longer be reasonable.  This is particularly true given that the Internet now provides for much wider availability of adult materials. These studies, and their analysis of secondary effects from the sale, distribution, or viewing of adult materials or performances, largely predate this development.  At the same time, however, the Court concludes that the studies are not presently so old as to make the City's reliance on them unreasonable.

Second, Plaintiff attempts to cast doubt on the City's reasoning by the submission of an article, co-authored by its expert Dr. Daniel Linz, challenging the existence of secondary effects of adult businesses as a myth and advocating a scientific approach to studying secondary effects.  Bryant Paul, Daniel Linz & Bradley J. Schafer, *Government Regulation of "Adult" Businesses Through Zoning and Anti-Nudity Ordinances: Debunking the Legal Myth of Negative Secondary Effects*, 6 Comm. L. & Pol'y 355 (2001) (the "Linz article").  The Linz article is critical of numerous studies of negative

secondary effects of adult businesses and the reliance upon these studies by municipal authorities.  The Linz article contends that studies finding a link between adult establishments and negative secondary effects are not scientifically sound and that more scientifically rigorous studies conclude that no negative secondary effects arise from adult businesses.

The Linz article's critique of the studies on which the City relied is not determinative in this case.  While municipalities may not rely on shoddy data, they are not required to base their analysis only on studies conducted according to scientific methods, as the Linz article argues.  To the contrary, it is clearly established that municipalities need not analyze evidence according to empirical, scientific standards. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 300 (2000); *see also Thames Enters., Inc. v. City of St. Louis*, 851 F.2d 199 (8th Cir. 1988) (rejecting argument that an empirical basis was necessary for finding deleterious effect of adult bookstore located within 500 feet of residential district).  Requiring adherence to scientific standards of analysis would be inconsistent with the deference that municipal authorities are given to analyze and address community issues when acting in their legislative function.  In fact, adopting such an analytical standard would require municipalities to ignore the valid, but not necessarily scientific, concerns expressed by average citizens in their communities.  Further, other courts have concluded that the analysis advocated by the Linz article is insufficient to meet the burden to cast doubt on a municipality's reasoning, even when supplemented by additional evidence, and the Court finds the reasoning employed in those cases persuasive.  *See Doctor John's v. Wahlen*, 542 F.3d 787 (10th Cir. 2008)

(concluding that the Linz article failed to meet burden to cast doubt because municipality relied on studies not considered by article and because empirical evidence is not required in enactment of ordinances).

In addition, the Linz article's approach largely ignores the fact-finding function in which municipalities engage when enacting ordinances.  The Linz article acknowledges that existing studies conflict as to whether negative secondary effects arise from adult businesses.  Conflicting evidence does not require a municipality to find that negative secondary effects are unlikely to occur.  Where a municipality is presented with conflicting evidence, municipal authorities may engage in fact-finding and ultimately may determine that a study finding such a link is more relevant or credible than a study that does not.  A municipality may also decide to disregard some studies.  The relevant question for courts reviewing these ordinances becomes whether the municipalities reasonably believed that secondary effects were likely to occur.

Third, Plaintiff further attempts to cast doubt on the City's rationale for the ordinance by submitting a study Dr. Linz conducted that analyzed the City's calls for police service ("CFS").  The study is titled:  "A Study of Adverse Secondary Effects of an [sic] Take-Home Merchandise Adult Bookstore in Moorhead Minnesota" (the "CFS study").  (Decl. of Daniel Linz, Ph.D. ("Linz Decl.") ¶ 3, Ex. 1.)  The CFS study opines that the Huff & Puff does not generate significant calls for service, and is not a source for negative secondary effects, specifically crime, traffic problems or disorder.  This study is insufficient to cast doubt upon the City's evidence and reasoning, however, because it addresses only one aspect of the negative secondary effects – reported crime.  The study

does not address unreported crime or neighborhood disruption, nor does it address blight or the impact on property values of an adult establishment.[3]   Further, while localized evidence can be considered in evaluating an ordinance, localized evidence of negative secondary effects is neither required nor determinative.  *Holmberg v. City of Ramsey*, 12 F.3d 140 (8th Cir. 1993) (rejecting argument that municipality is required to demonstrate substantial interest with localized studies and evidence that secondary effects actually exist).

Finally, Plaintiff attempts to cast doubt on the ordinance by arguing that the studies on which the City relied fail to distinguish between adult establishments that offer on-site entertainment or performances, such as nude dancing or peep-shows, and businesses such as Huff & Puff which sell magazines, videos, and sexual paraphernalia for consumption off-site.  This argument is somewhat persuasive.  The Court could well imagine that the secondary effects generated by each type of business could be different enough to warrant different regulations.  Ultimately, however, this argument also fails.

While some courts have suggested that the on-site/off-site distinction may be significant in determining whether an adult establishment has cast doubt on a

---

[3]   Dr. Linz's definition of negative secondary effects is unclear, but it appears to be fairly narrow.  Dr. Linz states that, in his opinion, an analysis of calls for service is the "only reliable information" upon which the City reasonably could have relied in determining the likelihood of negative secondary effects arising from adult establishments.  (Linz Decl. ¶ 3, Ex. 1 at 12.)  The Linz article also questions the relevance of home values to determining negative secondary effects.  (Paul, *supra* at 384.)  The Court is unpersuaded that the law requires such a narrow focus.  The concept of negative secondary effects is not limited to crime statistics, and decreasing home values and neighborhood blight are relevant concerns for municipalities considering adult use ordinances.  *ILQ*, 25 F.3d at 1416.

municipality's reasoning, *see, e.g., Doctor John's*,  542 F.3d at 793, the Eighth Circuit has not accepted this distinction and it is unclear whether it would do so.  In *ILQ*, an adult bookstore challenged an ordinance similar to the one at issue in this case. 25 F.3d at 1417.  There, the adult bookstore advanced the same argument presented by the Plaintiff here, contending that the city was required to disregard studies that did not distinguish between bookstores offering both adult and non-adult fare and having no facilities for on-site consumption.  *Id*. at 1418.  The Eighth Circuit specifically rejected the argument, stating that it was "simply not the law," and upheld the application of the ordinance.  *Id*. This Court does not consider *ILQ* to have been overruled by *Alameda Books*, and until the Eighth Circuit revisits this issue, this Court is constrained by *ILQ's* holding.

Further, while businesses offering on-site entertainment or performances may generate different secondary effects from those offering only materials for off-site consumption, the latter type of establishment may still generate *some* negative secondary effects that a municipality could reasonably desire to suppress.  *Id*. at 1418 (noting study of secondary effects relating to neighborhood in which adult establishments, including adult bookstore, were located included discarded pornographic literature in streets, sidewalks, bushes and alleys near adult businesses).  Under *City of Renton* and *Alameda Books*, municipalities are given some discretion to determine what negative secondary effects they might face and the best method to deal with those effects, within constitutional parameters.

In this case, the City was presented with a number of studies from which the City reasonably could have concluded that negative secondary effects arise from adult

oriented property uses.  The City also was presented with information regarding the

analysis of adult use ordinances by federal courts, particularly the U.S. Court of Appeals

for the Eighth Circuit.  In addition, citizens appeared at the public hearing in support of

the ordinance and testified as to their concerns.  One citizen indicated that his home is

only 75-feet from an adult establishment and that he was concerned for his family's

safety.  Another citizen stated that he was concerned about increased criminal activity

and decreased property values due to adult establishments.[4]  The Court concludes that the

City's evidence in support of the ordinance was sufficient.  The Court also concludes that

the City's evidence fairly supports the ordinance and that the City has shown that the

purpose and effect of the ordinance is the suppression of secondary effects.[5]

---

[4]    Plaintiff did not appear at the public hearing to testify.

[5]    Plaintiff argues that the City's process for enacting the ordinance was a sham and
suggests that the real purpose for the ordinance is to drive adult establishments out of
business.  In this case, the ordinance was considered by the City's planning commission
and twice by the City's council.  The City engaged a consultant, was provided with
studies and maps showing the opportunity areas for adult establishments depending on
the buffer zone adopted, and held a public hearing at which members of the public
testified.  The record reflects that the City's council members engaged in some debate
about the terms of the ordinance, including the length of the distance requirements,
whether to restrict adult establishments to only the heavy industrial area of the City, and
the restriction on the hours of operation and requirement that adult establishments close
on Sundays and holidays.  With respect to the provision regulating Sunday and holiday
closure, the council debated an amendment on which council members were nearly
evenly split and which failed by only one vote.  Ultimately, the ordinance did not pass
unanimously.  On this record, the Court cannot conclude that the City's deliberations
were a sham.  Further, courts generally do no look behind legislative findings and policy
statements to discern legislative bodies' hidden, rather than stated, purposes.
*Ambassador Books & Video, Inc. v. City of Little Rock, Ark.*, 20 F.3d 858, 863 (8th Cir.
1994).

**B.     Availability of Alternative Sites**

Plaintiff also challenges the ordinance on the ground that it does not provide sufficient alternative locations for him to relocate Huff & Puff and comply with the ordinance.  A time, place, and manner regulation must not "unreasonably limit alternative avenues of communication."  *City of Renton,* 475 U.S. at 47.  Further, ordinances must leave "the quantity and accessibility of speech substantially intact."  *Alameda Books*, 535 U.S. at 438 (Kennedy, J. concurring).

It is not necessary for a municipality to ensure that an adult business has access to commercially viable alternative sites.  *City of Renton,* 475 U.S. at 53-54.  Adult establishments "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees."  *Id.* at 54.  Therefore, an ordinance may be upheld even if an adult business is unable to secure another location.  *Alexander v. City of Minneapolis*, 928 F.2d 278, 284 (8th Cir. 1991).  Further, courts do not measure the reasonableness of an adult use ordinance based upon the economic impact relocation will cause.  *Id.* at 283; *Ambassador Books*, 20 F.3d at 864-865 (stating that "the cost factor is unimportant in determining whether [an] ordinance satisfies the standards of the First Amendment").

In *City of Renton*, the Supreme Court concluded that the ordinance left sufficient space open for relocation where 520 acres, or more than 5% of Renton's land area, was open for use as an adult theater site.  475 U.S. at 53.  The land included "ample, accessible real estate," acreage in all stages of development," and was "criss-crossed by

freeways, highways, and roads." *Id*. The Eighth Circuit also has upheld ordinances

leaving similar land areas available for relocation. *See, e.g., Alexander*, 928 F.2d at 283

(upholding ordinance where 6.6% of the city's total commercial acreage, including a

"myriad of block faces," was potentially available even though the adult establishment

was unable actually to secure another location); *Ambassador Books*, 20 F.3d at 864

(concluding ordinance leaving 6.75% of the land available with 97 available relocation

sites). An ordinance may not pass muster, however, where the land designated as

available for adult uses is not truly accessible or part of an actual market for commercial

enterprises. *See Northshor Experience, Inc. v. City of Duluth, Minn.*, 442 F. Supp. 2d 713

(D. Minn. 2006) (concluding that Duluth's ordinance did not leave a reasonable

alternative avenue for communication; though the ordinance left 4.34% of the city

available for adult uses, the plaintiff demonstrated via photographic evidence that the

available land was occupied by the airport or was "heavily industrial, either lacking

infrastructure and inaccessible or occupied by an existing heavy industrial use, such as a

manufacturing plant or mineral piles").

In this case, the record is insufficient for the Court to make an ultimate

determination as to whether the ordinance leaves a sufficient opportunity area for adult

businesses to relocate. According to the City, 642 acres, or 6.25% of the City's total land

area, is available for adult businesses. Further, the ordinance leaves 29% of the City's

commercial and industrial areas available for adult establishments. The City estimates

that there are four to six sites available that meet the ordinance's buffer restrictions. The

parties dispute whether these sites are platted and accessible by road, and the record

before the Court does not definitively establish the accessibility of the sites.  Further, the

character of the sites has not been established.  The Court is, therefore, unable to

determine whether any of these sites can reasonably be considered part of an actual

market for commercial enterprises.  Finally, the Court lacks any information regarding

the number of adult businesses that must relocate and whether the four to six available

sites are sufficient to leave the "quantity and accessibility of speech substantially intact."

*Alameda Books*, 535 U.S. at 438 (Kennedy, J. concurring).  The Court must, therefore,

deny the City's motion for summary judgment as to the issue of whether the ordinance

leaves sufficient space available for adult businesses.[6]

### C.    Amortization Provision

Plaintiff also challenges the ordinance's amortization provision.  A provision in an

ordinance allowing a grace-period before relocation is required is "known as an

amortization provision because it justifies the removal of a nonconforming use by giving

the owner a period of time to recoup (amortize) its investment before it must relocate."

*Jakes, Ltd., Inc. v. City of Coates*, 284 F.3d 884, 886-887 (8th Cir. 2002).  The Eighth

Circuit has upheld amortization provisions of varying lengths.  *See id.* at 889 (upholding

two-year amortization provision); *Ambassador Books,* 20 F.3d at 865 (three-year

amortization period upheld).

---

[6]    The Court anticipates that this issue could be addressed through a supplemental
submission, particularly if supported by photographic evidence.

In this case, the amortization provision allows non-conforming adult uses one year to relocate.  Adult establishments may also apply for an additional one-year extension.[7] It is clear that a municipality may require a non-conforming adult business to relocate, and the Court concludes that the time periods in the ordinance are not an unreasonable period of time for adult establishments to accomplish this.  The Court, therefore, concludes that the ordinance's amortization provision is valid.

### D.       Restriction on Hours of Operation

Finally, Plaintiff challenges the ordinance's restriction limiting the hours of operation for adult establishments and providing that adult establishments may not be open for business on Sundays or national holidays.  There is no information in the record establishing the reason that the City enacted this portion of the ordinance or the relationship between negative secondary effects and the hours of operation chosen by the City.  Members of the City's council did not discuss or debate the ordinance's restriction on the hours of operation for adult establishments.  There was some debate regarding requiring Sunday and holiday closure.  An amendment that would have stricken this part of the ordinance narrowly failed.  The record does not contain any information regarding the basis for this amendment or the substance of the debate regarding its terms.

The record is inadequate to permit the Court to determine whether the City reasonably believed that the restrictions regarding adult establishments' hours of operation are content-neutral and related to a substantial governmental interest.  *See Northshor Experience*, 442 F. Supp. 2d at 722-723 (noting that evidentiary basis for

---

[7]       The Plaintiff did not apply for an extension.

ordinance included no connection between hours of operation and negative secondary

effects).  The Court, therefore, denies summary judgment as to this issue.

## III.    Facial Invalidity

Plaintiff challenges the City's ordinance as facially invalid.  Declaring that the

"First Amendment needs breathing space," *Broadrick v. Oklahoma*, 413 U.S. 601, 611

(1973), the Supreme Court has identified two ways in which an ordinance may be facially

invalid:  "either because it is unconstitutional in every conceivable application, or

because it seeks to prohibit such a broad range of protected conduct that it is

unconstitutionally 'overbroad.'"  *Members of the City Council of the City of Los Angeles*

*v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984).  The first category includes statutes

that could never be applied in a valid manner.  *Id*. at 797-98.  The overbreadth doctrine

addresses statutes that, while they may be constitutional as applied to the challenging

party, are "written so broadly that they may inhibit the constitutionally protected speech

of third parties."  *Id*. at 798.  The Supreme Court has noted that application of the

overbreadth doctrine "is, manifestly, strong medicine," and that the "overbreadth of a

statute must not only be real, but substantial as well, judged in relation to the statute's

plainly legitimate sweep."  *Broadrick*, 413 U.S. at 613, 615.

Plaintiff challenges the application of the ordinance to Huff & Puff as a purveyor

of sexual items to be used or consumed off-site and asserts that the ordinance will apply

to third parties, such as "nude ballet, bawdy comedy, nude artwork and the like.  (Pl.'s

Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 48.)  The Court has determined

that the City's ordinance is content-neutral and relates to the constitutionally permissible

suppression of negative secondary effects arising from adult businesses.  As noted above, while this Court might be persuaded that some distinction can be made between adult establishments that offer on-site entertainment versus those that offer items only for off-site use, the City could reasonably believe that off-site businesses pose some risk of negative secondary effects.  Eighth Circuit precedent also supports that view.  Therefore, the ordinance can be applied constitutionally to the Plaintiff notwithstanding that the Plaintiff does not provide on-site adult entertainment.

As to the second part of Plaintiff's facial challenge, the Court concludes that the ordinance is not unconstitutionally overbroad.  The ordinance is limited to regulation of businesses that have a substantial component related to the depiction of or an emphasis on "specified sexual activities" or "specified anatomical areas."  (Def.'s Mem. at Ex. 2.) The term "Specified anatomical areas" is defined as follows:  "Less than completely and opaquely covered human genitals, pubic region, buttock, anus, or female breast(s) below a point immediately above the top of the areola; and  . . . [h]uman male genitals in a discernibly turgid state, even if completely and opaquely covered."  (*Id*.)  "Specified sexual activities" include the following:

> A.   Actual or simulated sexual intercourse, oral copulation, anal intercourse, oral-anal copulation, bestiality, direct physical stimulation of unclothed genitals, flagellation or torture in the context of a sexual relationship, or the use of excretory functions in the context of a sexual relationship, and any of the following sexually oriented acts of conduct: anilingus, buggery, coprophagy, coprophilia, cunnilingus, fellatio, necrophilia, pederasty, pedophilia, piquerism, sapphism, zooerasty; or

> B.   Clearly depicted human genitals in the state of sexual stimulation, arousal or tumescence; or

C.      Use of human or animal ejaculation, sodomy, oral copulation, coitus, or masturbation; or

D.      Fondling or touching of nude human genitals, pubic region, buttocks, or female breast(s); or

E.      Situations involving a person or persons, any of whom are nude, clad in undergarments or in sexually revealing costumes, and who are engaged in activities involving the flagellation, torture, fettering, binding or other physical restraint of such persons; or

F.      Erotic or lewd touching, fondling, or other sexually oriented contact with an animal by a human being; or

G.      Human excretion, urination, menstruation, vaginal or anal irrigation.

(*Id.*)  The speech and conduct identified as subject to regulation is, therefore, a fairly narrow segment of speech and conduct.  Further, the ordinance only regulates businesses that devote twenty percent of their floor space to adult uses or obtain more than twenty percent of their gross receipts from such uses.

The Court concludes that this ordinance is sufficiently narrowly tailored so that its sweep will not capture third parties engaging in lawful activities protected by the First Amendment.  Under the ordinance, a bookstore, movie rental establishment, or movie arcade could engage in the selling of adult items or entertainment for on-site or off-site consumption, so long as the floor space devoted to, or gross receipts derived from, such activities is less than twenty percent of the total for that establishment.  This would permit bookstores and movie rental establishments to maintain an adult section for customers desiring such goods.  Similarly, a movie theater could show films with images falling into the definitions of specified sexual activities and specified anatomical areas

under the same circumstances.  Alternatively, a business devoted exclusively to adult

entertainment may exist within the buffer zones created by the ordinance.  Therefore, the

Court concludes that the ordinance is not facially invalid.  The Court grants the City

summary judgment as to Plaintiff's facial invalidity challenge.

## CONCLUSION

The Court concludes that the City has not shown that there are sufficient available

sites for the relocation of existing adult businesses.  The City also has failed to support

the ordinance's restriction upon the hours of operation of adult businesses.  Therefore, the

City's motion for summary judgment is denied as to those issues.  As noted above, the

Court considers it possible that one or both of these issues could be resolved through the

submission of additional briefing and evidence and the Court is willing to consider a

request for such briefing.  Alternatively, because so few issues now remain to be

resolved, the Court encourages the parties to engage in settlement negotiations to

determine whether a settlement may be reached.  The Court grants the City's motion with

respect to Plaintiff's challenge to the evidence on which it relied in enacting the

ordinance and the ordinance's amortization provision.  The Court also grants the City's

summary judgment motion as to Plaintiff's facial invalidity challenge.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Defendant City of Moorhead's Motion for Summary Judgment (Doc. No.

26) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The Motion for Summary Judgment is **GRANTED** as to Plaintiff's challenges based on the evidence on which the City of Moorhead relied, the amortization provision, and facial invalidity;

b.      The Motion to Dismiss is **DENIED WITHOUT PREJUDICE** as to the availability of alternative locations and the ordinance's restriction upon adult businesses' hours of operation.


Dated:  February 9, 2009                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court